**SO ORDERED.**

**SIGNED this 23 day of December, 2009.**

_____
**Randy D. Doub
United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILSON DIVISION

| | |
|---|---|
| **IN RE:** | |
| **LARRY W. WELLS** | **CHAPTER 13** |
| **KAY F. WELLS,** | **CASE NUMBER:  08-04642-8-RDD** |
| Debtors | |
| **NORTH CAROLINA LOTTERY COMMISSION,** | **ADVERSARY PROCEEDING NUMBER:  08-00249-8-RDD** |
| Plaintiff | |
| v. | |
| **LARRY W. WELLS and KAY F. WELLS,** | |
| Defendant(s) | |

### ORDER DETERMINING THE DEBT OWED TO NORTH CAROLINA LOTTERY COMMISSION AS TO KAY F. WELLS AND LARRY W. WELLS IS DISCHARGEABLE

On November 2, 2009, the Court conducted the trial in this adversary proceeding to determine whether under 11 U.S.C. § 523(a)(4), the debt owed to the North Carolina Lottery

Commission (the "NCLC"), is excepted from discharge as to both Larry W. Wells and Kay F. Wells (collectively, the "Debtors").

The bankruptcy court has jurisdiction over the parties and subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, as well as, the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. This proceeding is a core proceeding that can be considered by this Court pursuant to 28 U.S.C. § 157(b)(2)(I).

Prior to the filing of bankruptcy, the Debtors owned and operated a Gas & Go Convenient Mart, a small convenience store, in Pikeville, North Carolina. In May 2006, the female debtor filed a retailer application seeking approval by the NCLC to sell lottery tickets. Ms. Wells' application was approved and the "Gas & Go" regularly sold and redeemed lottery tickets. In April 2008, the Debtors closed the convenience store after they were unable to maintain the lease. At that time, certain accounts were not current, including their account with NCLC. The parties agree that NCLC is owed $38,933.43.

On November 26, 2008, NCLC filed its complaint against the Debtors seeking to determine that the debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(4). NCLC asserts that pursuant to the contractual relationship between the parties, the Debtors were acting in a fiduciary capacity as to NCLC with respect to the proceeds from lottery sales and that the Debtors failure to turn over all such proceeds constitutes defalcation within the meaning of subsection (a)(4).

The Debtors argue that Section 523(a)(4) is not applicable in this case as the contract does not require the Debtors to maintain or establish a separate trust account for the benefit of the North Carolina Education Lottery ("NCEL"). The Debtors recognize that should the court disagree with

their interpretation of the contract language, the agreement itself is only signed by Kay F. Wells, the female debtor. As such, the Debtors request that if the Court finds that the agreement required a trust account, the debt should be excepted from discharge only as to Mrs. Wells, not Mr. Wells.

Section 523(a)(4) provides that a debt from fraud or defalcation while acting in a fiduciary capacity may not be discharged under section 1328(a)(2). The Fourth Circuit, in an unpublished decision, determined that Section 523(a)(4) requires an **express or technical trust** to have been imposed **prior** to any alleged misappropriation of funds. *Memo Money Order Co. v. Davis et al. (In re Davis)*, Adversary Proceeding No. 06-00012-8-JRL (Bankr. E.D.N.C. May 23, 2007) (citing *Harrell v. Merchant's Express Money Order Co. (In re Harrell)*, 1999 U.S. LEXIS App. 4743 (4th Cir. 1999)) (*emphasis added*).[1]

For the debt to be nondischargeable under section 523(a)(4), a creditor must establish that the debtor acted in a fiduciary capacity. Therefore, were Mr. and Mrs. Wells, by virtue of their agreement with NCEL, acting in a fiduciary capacity?

The term "fiduciary capacity" is a question of federal law even though state law should be considered in its determination. 2-523 *Collier Bankruptcy Manual,* ¶ 523.09 (3rd rev. 2009). Fiduciary has been narrowly defined. *Id.* The relevant law that creates the relationship must clearly

---

[1]*Harrell* is an unpublished table decision of the Fourth Circuit. *Harrell v. Merchant's Express Money Order Co. (In re Harrell)*, 173 F.3d 850. The text of the opinion is available at 1999 U.S. App. LEXIS 4743. In that case, the court recognized that a fiduciary is limited to situations involving a technical or express trust and that constructive trusts or trusts ex malificio fall short of the requirements of Section 523(a)(4). *Harrell*, 1999 U.S. App. LEXIS * 8. However, more recently in *Kubota Tractor Corp. v. Strack*, the Fourth Circuit noted that it has "not yet had the opportunity to determine, in a published opinion, the proper contours of the term 'fiduciary' as used in § 523(a)(4)." 524 F.3d 493, fn. 6. The *Kubota* court went on to say that because the term fiduciary is not specifically at issue in that case, it declined to elaborate on whether or not such trusts fall within its realm. *Id.* (finding that the trust at issue was in fact an express trust based on the intent of the parties included the language in the agreement).

outline the duties and identify trust property. *Id.* "If the applicable nonbankruptcy law does not clearly and expressly impose trust-like obligations on a party, the court will not assume that such duties exist and will not find that there was a fiduciary relationship." *Id.* Typically, an express trust is created by written agreement and a court must ascertain whether or not "the debtor has unrestricted use of the assets in question or, instead, was required to use the assets for the benefit of the creditor." *Id.* If there is no fiduciary relationship, then a debt should be discharged.

In North Carolina, a trust is a legal relationship between persons that can be expressly agreed upon in writing, words, or by definite conduct. In order to trigger the applicability of section 523(a)(4), there must be a technical or explicit trust. *Keener Lumber Co., Inc. v. Perry,* Adversary Proceeding No. S-02-00007-5-JRL * 7 (Bankr. E.D.N.C. October 2, 2002).

*Collier* recognizes that "the mere fact that state law places two parties in a relationship that may have some characteristics of a fiduciary relationship does not necessarily mean that relationship is a fiduciary relationship..." 2-523 *Collier Bankruptcy Manual,* ¶ 523.09 (3rd rev. 2009). Section 523(a)(4) requires the existence of an express or technical trust. *Id.* The technical or express trust must be created by agreement or by statute that specifically imposes a fiduciary obligation. *Keener Lumber Co., Inc. v. Perry,* Adversary Proceeding No. S-02-00007-5-JRL (Bankr. E.D.N.C. October 2, 2002). Without such a fiduciary obligation, a technical or express trust is not created and the Court is not bound by the holding in *Kubota.*[2] 524 F.3d 493.

---

[2] *Kubota* held that the language "shall segregate the proceeds from the sale and hold the same in trust for [Kubota]" was sufficient to evidence the intent of the parties to create a trust relationship. 527 F.3d at 495-499. The facts of this case are different. Here, the sweep account did not segregate the funds from the proceeds of sold lottery tickets. The sweep account was used by NCEL to electronically transfer funds due to NCEL.

The Court finds that neither a technical nor express trust was created here and, therefore, neither were the fiduciary obligations required by Section 523(a)(4). Consequently, the debt owed to NCLC, on behalf of NCEL, is dischargeable.

A creditor has the burden of proof to establish that a debt is nondischargeable by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279 (1991). NCLC has not satisfied its burden of proof.

In support of its case, NCLC offered testimony from Michael Suggs, a collections manager who has worked with the North Carolina Education Lottery Commission ("NCEL") since February 26, 2006. As a collections manager, he is responsible for collecting debts or referring matters to the attorney general's office, and collection agencies. He also handles accounts with respect to the electronic funds transfer ("EFT") information, and works in connection with the retailer accounting office. He testified that all retailers are required to set up "in trust for North Carolina Educational Lottery" accounts that will only be used for lottery funds and that allow for a weekly sweep of those accounts by NCEL. The systems are designed to allow for a Sunday to Saturday selling period. On Saturday night, an invoice is generated to download to the terminal. On Sunday morning, retailers can see how much should be deposited into the "lottery account" before the sweep. Mr. Suggs stated that the NCEL requests that the funds be deposited by 2:00 p.m. on Monday. Subsequently, NCEL will withdraw that money through a sweep or will deposit funds if NCEL owes the retailer money.

With respect to ticket activation, sales, and billing, the NCEL does not know when each instant ticket is sold. Instead, Mr. Suggs stated that instant tickets are settled to the invoice 21 days from date of the activation of said tickets. He stated that a retailer essentially gets three weeks before it pays for those tickets. If all of the tickets are not sold, a retailer is still liable to NCLC for

the entire amount due for the activated roll of instant tickets. However, a retailer may continue to sell those tickets after it has paid for them.

NCLC offered several exhibits in its effort to establish that the account maintained by the Wells was in fact a "trust" account for the benefit of NCEL. Exhibit 1 is the promotional materials that were forwarded to retailers who expressed an interest in becoming a lottery retailer. The promotional materials include a General Retailer Information sheet, a Retailer Highlights page, and a copy of the application packet retailers must submit to NCEL.

Mr. Suggs testified that these materials were provided to any retailer who expressed an interest in selling lottery tickets. He stated that to the best of his knowledge, he believed the Retailer Highlights page and the General Information sheet were provided to the Wells prior to the submission of the application.[3] Exhibit 1 also includes a blank application packet, including the Retailer Contract.

NCEL introduced Gas & Go Convenient Mart's application materials as Exhibit 2. Kay F. Wells executed the application as the authorized agent of Gas & Go Convenient Mart. The application packet includes forms A through G, except Form D,[4] and a W-9 form. *See Exhibit 2*.

Mr. Suggs testified as to the various forms that are included in the application packet, including, Form A - Retailer Application; Form B - Electronic Funds Transfer Authorization (EFT);

---

[3]The Court notes that the Retailer Highlights page introduced as part of Exhibit 1 provides that the application deadline was February 3, 2006 for installation of a lottery terminal by April 5, 2006. Mrs. Wells' application was not filed with the NCEL until May 23, 2006.

[4]Form D is omitted from Exhibit 2; however, a copy of Form D - Financial Guidelines for North Carolina Education Lottery Game Retailers is included as part of Exhibit 1. This form does not require an applicant's signature.

Form C - North Carolina Education Lottery Game Retailer Contract; Form E - Retailer Self-Certification of Compliance with the Americans with Disabilities Act; Form F - Retailer Background Information; and Form G - Consent and Authorization for Release of Personal Background Information.

The language used on Forms B, C, and D set forth the parameters of the financial responsibilities of the parties. Form B provides that the signatory authorizes

> the North Carolina Education Lottery to make automatic withdrawals for deposits each week from or into my **business checking account** which is at the following Depository Financial Institution...and authorize DFI to charge such withdrawals or deposits to my listed account. Adjusting entries to correct errors and to collect additional charges, which may include penalties and/or interest, are also authorized.
>
> It is agreed that these withdrawals, deposits and adjustments will be electronically made by the Electronic Fund Transfer System (EFT) under the rules and regulations of the North Carolina Education Lottery and the National and Local Automated Clearing House (ACH) Associates. I understand that this authorization will remain in effect until thirty (30) days advance notice of termination or change of account is given to the North Carolina Education Lottery. I HAVE ATTACHED A VOIDED CHECK (No deposit slips) TO THIS FORM FOR THIS ACCOUNT.

*Emphasis added.*

Ms. Wells properly set up an electronic funds transfer account pursuant to Form B permitting the NCEL to make certain withdrawals and deposits from an account. The form provides that the funds be withdrawn or deposited into a **business checking account** but does not set forth any specific requirements as to how this account should be titled. Furthermore, there is no specific language indicating that this account was, in fact, to be a trust account for the benefit of NCEL or NCLC.

Attached as part of Form B is a photocopy of a check provided by Ms. Wells drawn on a BB&T account. The payor of the check is Kay Frances Wells, DBA Gas & Go Convenience Mart.

The account name does not include the "in trust" language. Neither NCEL or NCLC objected to the account information provided by Ms. Wells and electronically transferred funds from this account on a regular basis. Furthermore, Mrs. Wells did not testify at the hearing. Without such testimony, the Court can not infer that Mrs. Wells intended to create an account in trust for the NCEL.

Form C is the actual Retailer Contract. Paragraph 25 of the contract provides:

> [a] lottery game retailer must make full financial settlement with the Commission every week via electronic funds transfer (EFT) or other recorded financials as authorized by the Commission and approved by the Director. The Commission may require full financial settlement more than once a week under certain conditions. The lottery game retailer is responsible for proceeds from the sale of all online game tickets sold that week and all instant ticket packs settle[d] as noted in item 2[4] above. The Commission will notify the lottery game retailer of the amount due (or credit owed) each week. Lottery game retailers who have non-sufficient funds (NSF) to cover their weekly EFT will be assessed a fee in accordance with the Lottery Retailer Financial Guidelines. A lottery game retailer may be required to supply a security deposit in an amount determined by the Commission. Repeated NSF's could cause a lottery game retailer's lottery certificate to be revoked and this contract to be terminated....

Paragraph 24 of Form C states that instant tickets will initially be settled within five days of activation but after 60 days of operation, instant tickets will be settled 21 days after activation. As a result, even if tickets have not been sold within 21 days of activation, a retailer is required to pay the NCEL for the activated tickets. The activated tickets may still be sold after 21 days but no funds from the subsequent sales need to be paid over to the NCEL.

Lastly, Form C requires the signature of the owner or authorized agent under which that person agrees to be bound by the terms of the contract, the Official Commission Rules and the North Carolina State Lottery Act.

Page 4 of Form C was signed and dated by Kay Wells on April 24, 2006. Even though the first three pages of Form C included as part of Exhibit 2, contained a notation at the bottom

providing "Revised 6/27/2006" - more than 2 months after the date Ms. Wells signed the form, Mr. Suggs stated that the NCEL typically only maintained signature pages in its files and that the Form C provided to Mrs. Wells would have been the same. As quoted above, the Form C introduced into evidence does not include the word "trust" or any indication that the parties intended to create a trust or fiduciary account.

Form D sets forth the Financial Guidelines for North Carolina Education Game Retailers and provides retailers with certain conditions and guidelines to "ensure fair and equitable handling of all financial circumstances with regard to lottery game retailer accounts." Any deviation from the guidelines set forth in the form shall be at the discretion of the Executive Director.

Specifically, this form details a retailer's responsibility to pay for lottery tickets on a weekly basis through an electronic funds transfer. As provided on Form D, the NCEL has the discretion to increase the number of transfers at its discretion. Form D also provides that "[i]t is the responsibility of the lottery game retailer to deposit all lottery proceeds into a designated bank account daily." Should there be insufficient funds at the time of the NCEL sweep, including fees, the Executive Director has the discretion of disabling the lottery equipment, accepting checks as a form of payment, and requiring a security deposit in certain instances. Furthermore, Form D provides that multiple insufficient fund payments during a six-month period disqualifies a retailer from certain incentives.

In order to establish that the parties intended to enter into a trust relationship, NCEL relies heavily on the language from the Retailer Highlights page and the General Retailer Information sheet. The Court notes that these pages include a term that requires an account to be titled as "In Trust for the North Carolina Education Lottery and that they "may" have been included in the

9

promotional materials provided to Mrs. Wells. However, these materials are just that - promotional materials. There is no corroborating evidence before the Court that Mrs. Wells received the promotional materials or agreed to their terms.[5]

Without any testimony from the Debtors that they in fact saw these documents and agreed to the terms set forth in them and with the inconsistent terms on the Forms in the application packet, the Court cannot find that the Wells' actions create an express or technical trust. The account used by the NCEL to electronically transfer funds did not include the "in trust" language as required by the information pages and these information pages were not included as part of the application forms themselves. The Court finds it hard to determine that a trust was created when there is not a preponderance of evidence that the parties intended to do so.

The Debtors assert that they had no intent to establish a fiduciary relationship with NCEL or form a trust account. As support for their position, the Debtors introduced a copy of the NCEL Retailer Contract revised as of May 8, 2008. Counsel for the debtors stated this document was provided to him from NCLC as part of the discovery process. The Court notes that number 4(f) of this contract now provides that retailers must establish a separate bank account dedicated for lottery proceeds that should be held **in trust** and that such funds **shall not be commingled** with other funds or assets of the retailer. Therefore, some time between the June 27, 2006 contract and the May 8,

---

[5]Exhibit 3 is an excerpt from the North Carolina Education Lottery Policies and Procedures Manual related to Retailer Rules and Regulations. The excerpt states that the policy was revised on August 31, 2007, November 26, 2007, May 21, 2008, and approved on May 30, 2008. Approval of this policy is approximately 2 years after Mrs. Wells completed the application. There is nothing in the record indicating that these policies were in fact provided to Mrs. Wells, that NCEL contacted Mrs. Wells about converting the EFT sweep account to a trust account that was properly titled "In Trust for the North Carolina Education Lottery," or what in fact the policy was at the time that Mrs. Wells submitted the application.

2008 revision, the NCLC elected to incorporate the trust provision language into its actual contract with its retailers.

The Court views this change in the terms of the application as significant. In making this change, the NCLC recognized that the trust language was not included as part of its actual retailer contract and, therefore, may have prevented a retailer from forming the intention to enter into a trust relationship and understanding that a fiduciary relationship had been created. As noted above, this language is not included as part of the application forms signed by Mrs. Wells.

Nowhere in the application packet is there a reference to a trust account or an account being held solely for the benefit of NCEL. In fact, the application seems to provide a process for collection should there be insufficient funds in the account. By having such a process, NCLC foresaw that lottery game retailers would commingle lottery proceeds and general receipts. Mr. Wells testified he often commingled the proceeds from the lottery sales and would add funds into the business account once a weekly statement was provided by the lottery. The NCEL requested customers to have funds available by 2:00 p.m. every Monday. Clearly, NCEL anticipated the commingling of funds. The knowledge that a debtor is regularly commingling funds supports a finding that an account is not being held in trust and that the Debtors are not acting in a fiduciary capacity.

In addition, Form C requires that a retailer pay for activated tickets after 21 days, regardless of whether or not those tickets have in fact been sold. As such, a retailer may have to withdraw funds from its operating account to cover the weekly payment to NCEL. Since the retailers would not have received any proceeds related to unsold tickets, those funds cannot be considered to be in trust for NCEL. Both of these factors support a finding that the account set up for electronic

transfers was not a trust account and that the Debtors and NCEL did not have an agreement to create a technical or express trust.

The account appears to the Court to be one for convenience of electronic drafting rather than a trust account. Ms. Wells agreed to allow NCEL to withdraw funds from an account. That is all she was required to do under the terms of the application. Setting up an account to allow for electronic transfers in and of itself does not rise to the level of intent to create a trust. Without establishing some form of intent, either verbal, by her actions, or in writing to enter into a trust relationship, a fiduciary relationship cannot arise and a trust is not created.

Therefore, the Court finds the facts of this case are distinguishable from the facts in *Kubota*. There are no specific provisions in the agreement between the parties evidencing an intent to hold funds in trust for the benefit of NCLC.

NCLC, on behalf of NCEL, has failed to meet its burden of proof that the debt is nondischargable by failing to establish by a preponderance of the evidence that there was a technical or express trust between the Debtors and NCEL. Without such trust, the fiduciary relationship does not exist. The Court finds that the Debtors did not act in a fiduciary capacity required by Section 523(a)(4).

Therefore, Judgment shall be entered in favor of the Defendants, Larry W. Wells and Kay F. Wells. The debt owed to NCEL in the amount of $38,933.43 will be discharged upon the completion of their Chapter 13 Plan and entry of the Chapter 13 discharge pursuant to 11 U.S.C. § 1328(a).

**SO ORDERED.**

**END OF DOCUMENT**